## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOHNNY ABEL GONZALES,

      Plaintiff,

                                     Case No. 1:22-CV-00482

  v.

COURTYARD MANAGEMENT CORPORATION,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment on All Counts in Plaintiff's Amended Complaint and Supporting Memorandum ("Motion") [Doc. 41]. The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be granted as to all claims.

## BACKGROUND

When viewed in the light most favorable to Plaintiff as the non-moving party, the facts supported by evidence are as follows. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010). The Courtyard Albuquerque Airport (the "Hotel") is located a short distance from the Albuquerque International Sunport. Doc. 23 at 2, ¶ 1; Doc. 41-1 at 60:21-23. The Hotel is managed by the Courtyard Management Corporation ("Defendant"). Doc. 23 at 1. Defendant is incorporated in Delaware, but its primary place of business is in Bethesda, Maryland. Doc. 1 ¶ 4.

Shortly after midnight, in the early morning hours of Friday, April 16, 2021, Johnny Gonzales ("Plaintiff") arrived without a reservation at the Hotel. Doc. 41-1 at 56:4-19. Plaintiff had just flown in from an out-of-state work trip and was looking for lodging before driving home

the next morning to Ruidoso, New Mexico, nearly three hours from Albuquerque. *Id*. When

Plaintiff arrived, Ruby Rubio, a night clerk who is no longer employed by Defendant, told him

that no rooms were available – even though Plaintiff had seen online availability before arriving.

Doc. 23 at 2; Doc. 41-1 at 60:5-61:6; Doc. 41-3 ¶ 3. Plaintiff went outside, called the Marriott

reservation line, and successfully booked a room at the Hotel for that night. Doc. 41-1 at 62:16-

63:22. Plaintiff has status with Marriott and had stayed at this and other Marriott properties on

many occasions. Doc. 23 at 2-3; Doc. 41 ¶ 11.

 After coming back into the lobby, Plaintiff showed Ms. Rubio proof of his reservation,

again asked to be given a room, and was once again denied. Doc. 41-1 at 62:25-63:15. Confused,

Plaintiff stayed in the lobby and called Marriott customer service yet again to resolve the issue

and file a complaint. Doc. 41-1 at 63:16-65:4. While he was on the phone, a Caucasian man

arrived and was given a room, which Plaintiff attributed to his assumption that the other man and

the Hotel staff were both white. Doc. 41-1 at 65:6-68:12; Doc. 23 at 2. At that point, Plaintiff

was upset and exclaimed, "that's not fair," before being escorted out of the Hotel by Russell

Garrett, a shuttle driver for the Hotel, who was the only other staff member on duty at that time.

Doc. 41-1 at 65:11-12; Doc. 41-2 at 18:21-21:10. According to Mr. Garrett, Plaintiff told him

that he thought Ms. Rubio was discriminating against him. Doc. 41-2 at 18:8 (as modified by the

correction sheet).

 Plaintiff then went next door to the Fairfield Inn, another Marriott property, and spent the

night there without issue. Doc. 41-1 at 74:9-75:4. The following morning, Plaintiff called the

Hotel and spoke to an unnamed man who identified himself as a supervisor, apologized to

Plaintiff for his experience, attributed Ms. Rubio's actions to the fact that there is a lot of crime

in the area, and explained that she mistook him for a criminal. *Id.* at 76:18-78:19. At that point,

Plaintiff called the main 1-800 Marriott number to make a complaint. *Id.* at 78:21-79:1. Later

that day, the general manager of the Hotel, Christopher "Chris" Van Zele, called Plaintiff to

apologize for his employee's conduct and offered him additional loyalty perks. *Id.* at 78:24-81:6.

Mr. Van Zele reports that Plaintiff was "very, very upset" during the conversation. Doc. 41-3 at

24:23-25:2.[1] Plaintiff requested that Mr. Van Zele memorialize their conversation in an email

message, which Mr. Van Zele sent at 6:30 p.m. that evening. Doc. 48-1. Mr. Van Zele described

his email message as a "service recovery message," in which he apologized for the way Hotel

staff handled the situation, but did not include any specific admissions about the basis for Ms.

Rubio's decision not to rent Plaintiff a room. *Id.*; *see also* Doc. 41-3 at 28:19-29:11. Later, when

Mr. Van Zele asked Ms. Rubio why she did not rent Plaintiff a room, she told him that it was

because Plaintiff was behaving belligerently, seemed to be under the influence of something, and

started using profane language when he became upset about his check-in experience. Doc. 41-3

at 34:3-24.

　　　　On August 12, 2021, Plaintiff completed a "Public Accommodations – Preliminary

Questionnaire" and submitted it to the Maryland Commission on Civil Rights Division, in which

he documented the above-described incident. Doc. 48-2. Thirteen months later, on May 31,

2022, Plaintiff served Defendant with the instant complaint in New Mexico state court. Doc. 1 ¶

5. On June 30, 2022, Defendant timely removed the case to federal court, alleging federal

jurisdiction under both 28 U.S.C. § 1332(a) (diversity jurisdiction) and 28 U.S.C. §§ 1331, 1367

(federal question jurisdiction plus supplemental jurisdiction for the state law claims).[2] Plaintiff

---

[1] Mr. Van Zele is not the person with whom Plaintiff spoke during the first call, and Defendant does not otherwise know who that "supervisor" could have been. Ex. D (Doc. 41-4) ¶ 7.

[2] The civil cover sheet associated with the Notice of Removal only checked "Federal Question" as basis of jurisdiction. The instructions for that portion of the cover sheet only allow one box to be checked. However, the Court finds that the text of the Notice of Removal properly alleges diversity as an alternate basis for federal jurisdiction. *Compare* Doc. 1 ¶¶ 7-9 *with id.* at 5 (civil cover sheet).

filed an Amended Complaint on November 30, 2022, alleging a violation of Title II of the Civil Rights Act and bringing state claims for Intentional Infliction of Emotional Distress ("IIED"), Negligent Infliction of Emotional Distress ("NIED"), and negligence. Doc. 23. As a result of the incident, Plaintiff alleges that he has "lost much of his ambition and confidence," "feels stigmatized" for his race, and "cannot succeed in his work environment." *Id.* at 9. He seeks $100,000 in pain and suffering and emotional distress damages, plus $100,000 in punitive damages. *Id.* at 10. Plaintiff also seeks judgment requiring Defendant to take the following steps: (1) cease and desist from engaging in discriminatory practices as prohibited under federal law; (2) create an explicit anti-discrimination policy printed in the employment manual; (3) conduct mandatory training on their anti-discrimination policy and relevant U.S. law with all supervisory and management personnel; and (4) pay reasonable attorneys' fees and court costs. *Id.* at 10-11.

After the completion of discovery, Defendant filed the instant Motion, seeking summary judgment in its favor as to all claims in the Amended Complaint, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Doc. 41. Plaintiff opposes the Motion in its entirety. Doc. 48. The Motion is now before the Court.

## LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If there are genuine disputes as to any material facts, the court must "construe the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). It is not enough for any alleged factual dispute to exist. Instead, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). If the nonmoving party bears the burden of proof, then the moving party need only demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). If so demonstrated, the burden flips and the nonmoving party must articulate genuine issues of material fact related to "dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991). Such articulations cannot be conclusory and instead must "go beyond the pleadings … and designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). Here, even though Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Response") failed to specifically identify which of the undisputed material facts ("UMF") laid out in the Motion are controverted, as required by federal and local rules of civil procedure, the Court has done its best to identify places where Plaintiff's factual assertions contradict Defendant's listed UMFs and resolve those contradictions in the former's favor. Fed. R. Civ. P 56(a); D.N.M.LR-Civ. 56.1.

### DISCUSSION

A. Federal Claim: Violation of Title II of the Civil Rights Act of 1964 ("Title II")

    In his first claim, Plaintiff alleges that Defendant violated Title II by disallowing him, by virtue of his ethnicity, to book a room at the front desk of the Hotel despite the availability of rooms, and by ejecting him from the Hotel even though other people with the same ethnicity as that of the employees were allowed to check in. Doc. 23 at 7-8. Congress enacted Title II to ensure that all people can fully and equally enjoy "the goods, services, facilities, and privileges, advantages, and accommodations of any place of public accommodation," regardless of their "race, color, religion, or national origin." 42 U.S.C. § 2000a(a). Inns, hotels, and motels with

more than five rooms are included as public accommodations under 42 U.S.C. § 2000a(b)(1). The statute establishes a cause of action for injunctive relief to remedy discrimination in public accommodations, but monetary damages are not available. 42 U.S.C. § 2000a-3(a) (establishing civil cause of action for injunctive relief); *see also Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (plaintiffs "cannot recover damages" under Title II of the Civil Rights Act).

As Defendant notes in its Motion, Title II contains a notice provision. Doc. 41 at 7-9. Under that provision, if the alleged discrimination occurred in a state or locality with laws prohibiting that conduct, a plaintiff must give the state or locality the first bite at the apple by waiting 30 days after providing "written notice of [the] alleged act or practice … to *the* appropriate State or local authority by registered mail or in person" before filing the Title II claim. 42 U.S.C. § 2000a-3(c) (emphasis added). The full provision states:

> In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

42 U.S.C. § 2000a-3(c).

Defendant argues that Plaintiff's Title II claim fails as a matter of law because he did not provide notice to the New Mexico Human Rights Commission. Doc. 41 at 7. Its Motion directs the Court to a Tenth Circuit case, *Harris v. Ericson*, in which New Mexico was found to "have state law which prohibits [discriminatory acts or practices] and that it has created an administrative agency whose duty it is to seek relief from such practice." 457 F.2d 765, 766 (10th Cir. 1972); *see also Judd v. Coronado Mall Mgmt.*, No. CV 97-1092 SC/RLP, 1998 WL

36030603, at *4 (D.N.M. June 23, 1998). As Plaintiff concedes, that law (the Human Rights Act) and that agency (the New Mexico Human Rights Commission) continue to exist. *See* N.M.S.A. 1978 § 28-1-7(F) (prohibiting discrimination in places of public accommodation based on, *inter alia*, race, color, national origin, or ancestry); *id.* § 28-1-3(A) (establishing the New Mexico Human Rights Commission); *id.* § 28-1-4(A)(1) (authorizing the Human Rights Commission to "hear complaints and issue orders … concerning alleged unlawful discriminatory practice"). Complaints must be filed with the state within 300 days of the last alleged act of unlawful discrimination. N.M. Code R. § 9.1.1.8(B).[3]

Plaintiff concedes that he did not provide notice to New Mexico or a New Mexico locality.  Plaintiff does not, however, equally concede that he has failed to comply with the notice requirement of Section 2000a-3(c). According to Plaintiff, the fact that he provided notice to the Maryland Commission on Civil Rights ("MCCR") on August 12, 2021, satisfies the statutory notice requirement. Doc. 48 at 10. Plaintiff argues that Maryland law should apply "in toto on the proceedings" and leans on this overarching choice-of-law argument to justify why notice to MCCR satisfied Section 2000a-3(c). *Id.* at 2-5, 8-13.

This Court has identified two theories under which Plaintiff's notice to MCCR could satisfy the notice requirement, depending on whether the prohibited "alleged act or practice" occurred in Maryland or New Mexico. If the prohibited act or practice is Ms. Rubio's refusal to rent Plaintiff a room in Albuquerque, then Plaintiff's claim hinges on whether Section 2000a-3(c) allows notice to be provided to a state or locality other than the one where the conduct occurred. Alternatively, Plaintiff's notice to MCCR was proper if he can establish that the

---

[3] This regulation provides that complaints must be filed with the Human Rights Bureau ("Bureau") of the Labor Relations Division of the New Mexico Department of Workforce Solutions. The Bureau is the staff agency that receives and investigates complaints, whereas members of the Human Rights Commission are appointed volunteers authorized to adjudicate the complaints. N.M.S.A. 1978 § 28-1-4(B); *id.* § 28-1-3(A).

prohibited acts or practices are Defendant's failures to act from its Maryland headquarters in a way that would have prevented Plaintiff's injury. Each theory is addressed in turn.

1. Scenario Where Conduct Occurred in New Mexico

After a thorough review of the structure, purpose, and legislative history of Section 2000a-3(c), the Court holds that if the prohibited conduct occurred in New Mexico, then notice needs to have been provided to New Mexico rather than Maryland. This is the case for three reasons.

First, the use of a singular definite article demonstrates that Congress only intended for there to be one "appropriate State or local authority" for any given claim brought under Title II. 42 U.S.C. § 2000a-3(c). When faced with competing ways to interpret a statute, federal courts should strive to "give[] effect to every clause and word." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 385 (2013) (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011)). Congress required notice to "the" not "an" appropriate State or local authority, and this Court is obligated to assign significance to that decision. Accordingly, Maryland can only be the appropriate state if New Mexico is not the appropriate state. To the extent Plaintiff argues that notice could have appropriately been given to either state but that he chose Maryland, that argument is unavailing. *See* Doc. 48 at 10 (discussing how Plaintiff had been apprised of his "legal entitlement[]" to file notice with the New Mexico Human Rights Commission, implying that that would have been a viable alternate option but for the fact that "the window for such notice had lapsed" pursuant to state law).[4]

---

[4] Plaintiff's Response strongly implies that the deadline to file with the New Mexico Human Rights Commission had lapsed by the time counsel was retained and that this was the reason that he instead filed with MCCR. However, under New Mexico regulation, complainants have 300 days after the final act of alleged discrimination to submit a complaint. N.M. Code R. § 9.1.1.8(B). Since the conduct at issue occurred on April 16, 2021, the deadline for submission to NMHRC was February 9, 2022. Counsel was retained on June 15, 2021, and the MCCR complaint questionnaire was submitted on August 12, 2021 – both before the window to submit to NMHRC had expired. Doc. 48 at 7, 10 (date counsel was retained); Doc. 48-2 (date MCCR questionnaire was submitted). It is simply not true

Second, deeming Maryland to be the appropriate state when the conduct occurred in New Mexico frustrates the purpose of the notice requirement and transgresses the anti-absurdity canon of statutory interpretation. Congress enacted Section 2000a-3(c) to give states the first opportunity to ameliorate civil rights violations within their borders. As the *Harris* court explained:

> [T]he statute itself in very understandable language precludes institution of a federal court proceeding of this particular type without first giving the state an opportunity to remedy the situation, assuming, of course, that the state in question has state or local law on the subject. The legislative intent appears to us to be quite clear.

457 F.2d at 766. In other words, if the conduct occurred in New Mexico, then New Mexico law must be queried to determine if notice is required precisely because it only makes sense to impose that procedural burden if New Mexico has the capacity to right the wrong. Consider what Plaintiff's argument would require of him in a hypothetical scenario where all the facts in this case remained the same except that Maryland did not have state or local law on the subject. Notice would still be required since the conduct happened in a state with anti-discrimination laws (New Mexico), but it would need to be fruitlessly given to a state that, in this counterfactual, lacks the laws and enforcement capacity to take corrective action (Maryland). Permitting that scenario conflicts with the Supreme Court's direction to avoid interpreting statutes in a way that would allow absurd outcomes. *See, e.g.*, *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 455 (1989) ("[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.") (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2nd Cir. 1945), *aff'd*, 326 U.S. 404 (1945)).

Third, the legislative history shows that Congress did not intend for notice to be supplied to a state other than the one where the discrimination occurred. The Senate Committee on

---

that the window to notify NMHRC had lapsed by the time MCCR was notified.

Commerce report for the bill that would become Title II makes clear that Congress understood all the references to a state or locality in Section 2000a-3(c) to be to the state or locality where the discrimination occurred. The report characterizes the Title II cause of action as follows:

> The bill would guarantee all persons freedom from a refusal by an included establishment or organization to deal with them on account of race, color, religion, or national origin. Any person refused service by a public establishment on the above-mentioned grounds would have the right to seek a court order against the offending establishment or individual *after 30 days' written notice to a State agency or instrumentality authorized to deal with such disputes*.

S. Rep. No. 88-872, at 1 (1964), *reprinted in* 1964 U.S.C.C.A.N. 2355, 2356 (emphasis added). The emphasized portion of that excerpt demonstrates that Congress presumed the state receiving notice would be the same state that must have authority to remedy the dispute for Section 2000a-3(c) to apply.

For the above reasons, if the discriminatory conduct by Ms. Rubio is the prohibited "alleged act or practice" for purposes of Section 2000a-3(c), then Plaintiff's notice to MCCR is insufficient and his Title II claim must be dismissed for lack of subject matter jurisdiction. *See Harris*, 457 F.2d at 767 (Section 2000a-3(c) notice must occur "before the district court acquires jurisdiction"); *Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1143 (7th Cir. 1993) ("Because Stearnes failed to notify the appropriate state agency as required by 42 U.S.C. § 2000a–3(c) before he filed his case in federal court, we remand the case to the district court and order the case dismissed for lack of jurisdiction.").

2. Scenario Where Conduct Occurred in Maryland

Nevertheless, based on the same analysis, Plaintiff's notice to MCCR was proper if the five failures to act that Plaintiff attributes to Defendant constitute the prohibited act or practice. *See* Doc. 48 at 5. In his Response, Plaintiff claims that Defendant failed to: (1) "engage in non-discriminatory practices as prohibited under Title II and all applicable U.S. law"; (2) "create an

10

explicit anti-discrimination policy"; (3) "conduct mandatory training on their anti-discrimination policy and relevant U.S. law with all supervisory and management personnel"; (4) "investigate a claim of discrimination filed by Plaintiff at their headquarter in Bethesda, Maryland"; and (5) "exercise ordinary care to further prevent their agents from engaging in discriminatory practices as prohibited under Title II and all other applicable U.S. law." *Id.* For Plaintiff to prevail under this theory for why his notice to MCCR was proper, the first step is to determine whether those five allegations of inaction may be considered, given that Plaintiff did not include them in his Amended Complaint, but rather first raised them in his Response. Doc. 48 at 5; *c.f.* Doc. 23 at 2 ("[A]ll acts alleged herein[] occurred in Bernalillo County, State of New Mexico.").

In the Tenth Circuit, when new allegations are included in a response to a motion for summary judgment, they are treated as "a potential request to amend the complaint." *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 971 (10th Cir. 2021) (quoting *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003)). Amendments to pleadings more than 21 days after initial service require the court's leave, which should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave to amend may be denied when the amendment would be futile. *See TV Comm. Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1028 (10th Cir. 1992) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Futility can be established if the complaint as amended would still succumb to a motion for summary judgment. *Bauchman for Bauchman v. West High School*, 132 F.3d 542, 562 (10th Cir. 1997) ("A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment."). Applying that standard, Plaintiff's implied request to amend his complaint

a second time is denied both because it is not in the interest of justice and because it would be futile.

First, allowing amendment at this stage in the litigation would not be in the interest of justice. Undue prejudice to the other party is the "most important[] factor" when a court decides a motion to amend a complaint. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1207 (10th Cir. 2006) (relying on factors identified in *Foman v. Davis*, 371 U.S. 178 (1962)).[5] In *Minter*, the Tenth Circuit noted that undue prejudice most often occurs "when the amended claims arise out of a subject matter different from what was set forth in the complaint and *raise significant new factual issues*." 451 F.3d at 1208 (emphasis added). In such circumstances, allowing an amendment would be prejudicial because it would negatively affect the defendant's ability to prepare a defense. *Id.* (citing *Patton v. Guyer*, 443 F.2d 79, 86 (10th Cir. 1971)). It is especially problematic when a "plaintiff was aware of all the information on which his proposed amended complaint was based prior to filing the original complaint." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th Cir. 1998); *c.f. Minter*, 451 F.3d at 1210-11 (defendant was not prejudiced by plaintiff's proposed amendment to his complaint because the situation shifted after defendant stipulated to an "extraordinary change in its account of what happened").

In this case, the parties underwent substantial discovery that focused entirely on the events that took place at the Hotel as well as information about Plaintiff's medical history.

---

[5] The relevant excerpt from *Foman* states:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. at 182 (quoting Fed. R. Civ. P. 15(a)).

Allowing Plaintiff to subsequently allege that the five failures to act by Defendant represent discriminatory acts or practices under Title II would open wholly new factual questions for discovery related to Defendant's corporate policies and practices. Those inquiries could have been but were not earnestly pursued during discovery. To the limited extent that such facts were brought to light, the uncontroverted record indicates that Defendant *does* conduct anti-discrimination training for its employees. Doc. 41-2 at 24:6-25:25. And unlike in *Minter*, at no point did Defendant change its account of what happened such that Plaintiff would need to change his pleadings in response. Plaintiff thus forewent the chance to use the discovery process to unearth facts connecting his experience to Defendant's corporate conduct in Maryland.

Alternatively, Plaintiff's implied request to amend is futile because Defendant would be entitled to summary judgment even if the amendment were allowed. This is true for two reasons. The first returns the Court to the *Celotex* burden-shifting standard discussed *supra* pp. 4-5. Treating Plaintiff's failure-to-act claims as if they were raised in the Amended Complaint, the question becomes whether Defendant has met its burden of "pointing to a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Sports Unltd., Inc. v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002). The Court finds that it did. Defendant's Reply in Support of Motion for Summary Judgment on All Counts in Plaintiff's Amended Complaint and Supporting Memorandum ("Reply"), which was Defendant's first chance to address the failure-to-act claims raised in the Response, notes that "Plaintiff cites no evidence of [Defendant's] training or policies (or that any were requested but not produced), much less facts showing that Rubio's alleged discriminatory conduct could be attributed to a lack of training or lack of adequate corporate policy enforcement arising in Maryland." Doc. 49 at 4. Defendant also observes that "Plaintiff conducted virtually no discovery on those issues." *Id.* In

the face of Defendant's absence-of-evidence arguments, Plaintiff made no attempt to identify specific facts showing genuine issues for trial. *Celotex*, 477 U.S. at 324. If Plaintiff felt that he had specific facts to raise that would meet his burden, he could have requested the Court's leave to file a surreply. *See* D.N.M.LR-Civ. 7.4(b). He did not do so.

Indeed, because Plaintiff raised his failure-to-act allegations in the first instance only *after* substantial discovery was completed, the kind of discovery information referenced in *Celotex* was already available to Plaintiff. Thus, he could have cited to specific facts that would create a genuine issue for trial at the time he raised those allegations. Specifically, in his response brief, he could have gone "beyond the pleadings" and included information generated by discovery (e.g., affidavits, depositions, answers to interrogatories, and admissions on file) to designate specific disputed facts for trial. *Celotex*, 477 U.S. at 324. Because Plaintiff thus has not carried the burden necessary to overcome summary judgment on the new failure-to-act allegations, granting his implied request to amend the Amended Complaint to allow those factual allegations would be futile.

Second, amendment would be futile because the newly alleged inaction cannot satisfy Title II's definition of a prohibited act or practice. Title II's operative prohibition states that "[n]o person shall … withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive any person of any right or privilege secured by section 2000a or 2000a-1." 42 U.S.C. § 2000a-2. The notice provision relates back to that prohibition when it uses the phrase, "[i]n the case of an alleged act or practice prohibited by this subchapter…" *Id.* § 2000a-3(c). As a matter of statutory interpretation, 42 U.S.C. § 2000a-2's prohibition is not capacious enough to include the failures to act that Plaintiff alleges. None of the five alleged failures to act indicate that Defendant withheld, denied, or deprived Plaintiff of a public accommodation, or attempted to do any of the

same. Instead, Plaintiff's claims, taken as true, would indicate that Defendant created a corporate environment that increased the risk that its agents at individual hotel locations would discriminate against would-be guests. And in cases where that risk materialized, it would be Defendant's agents' conduct at the individual hotel location that amounted to a withholding, denial, or deprivation. Indeed, Plaintiff's arguments implicitly acknowledge that Defendant's alleged inaction depends on further action by its agents to amount to discrimination. One of the new allegations is a failure by Defendant to "prevent [its] agents from engaging in discriminatory practices." Doc. 48 at 5. Similarly, when discussing the IIED claim in his Response, Plaintiff argues that Defendant "endorsed [Ms. Rubio and Mr. Van Zele's] outrageous conduct" and should be "held liable for their conduct." *Id.* at 34. These allegations show Plaintiff's acknowledgement that the alleged corporate inaction is not itself discrimination within the meaning of the statute.

That is not to say an employer's failure to affirmatively guard against discrimination by their employees is irrelevant to a Title II claim. Failures to act of the sort alleged by Plaintiff may be used to determine whether respondeat superior liability applies. *See, e.g.*, *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1373 (S.D. Fla. 1999) (rejecting employer's respondeat superior liability for employee's Title II violation because, *inter alia*, employee "violated explicit company policies prohibiting such conduct" and thus "acted outside the scope of his employment"); *see generally Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (analyzing scope of employment and respondeat superior liability issues for sexual harassment claim brought under Civil Rights Act Title VII). However, even then, Defendant's acts or omissions in Maryland would not be the underlying discriminatory conduct in this case. Rather, it would be conduct relevant to assigning respondeat superior liability to Defendant for Ms. Rubio's conduct

in New Mexico, and, as the Court has already established, Plaintiff's claims premised on discriminatory conduct in New Mexico fail for lack of Section 2000a-3(c) notice. Accordingly, the Court holds that Defendant would be entitled to summary judgment even if the implied request to amend were granted since none of the five failures to act in Maryland alleged by Plaintiff are themselves violations of Section 2000a-2.

Thus, Plaintiff's implied request to amend his complaint a second time is denied because justice would not be served by granting the amendment and because the amendment would be futile on two different grounds. All that remains is Ms. Rubio's conduct, which both parties agree took place in Bernalillo County, New Mexico. The Court sympathizes with Plaintiff's experience and agrees that there are disputed questions of fact related to, *inter alia*, what Ms. Rubio said, how Mr. Van Zele reacted, and whether there were legitimate, non-discriminatory reasons why Plaintiff was denied a room. However, as noted above, Plaintiff's lack of timely notice to the New Mexico Human Rights Commission strips the Court of subject matter jurisdiction over his Title II claim. The Court thus is left with no choice but to dismiss this claim as a matter of law.

B. <u>State Law Claims</u>

Plaintiff also alleges injury cognizable under three state law torts: intentional infliction of severe emotional distress, negligent infliction of emotional distress, and simple negligence. Plaintiff is a citizen of New Mexico alleging more than $75,000 in damages and Defendant is a citizen of Maryland. Doc. 23 at 1, 10; Doc. 1 ¶ 4. On those facts, this Court would have diversity jurisdiction over the instant case even if the original complaint included no federal claim. 28 U.S.C. § 1332(a). Thus, despite dismissing Plaintiff's federal Title II claim, the Court must consider Plaintiff's remaining claims. *See, e.g.*, *Wright v. Musanti*, 887 F.3d 577, 581-82 (2d Cir.

2018) (taking no issue with the fact that, "[a]fter dismissing the sole federal claim, the district court determined that it retained subject matter jurisdiction over the state law claims based on diversity jurisdiction").[6]

Pursuant to the *Erie* doctrine, when federal courts sit in diversity to hear state claims, they apply federal procedural law and state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 416 (1996). Courts must look to the choice-of-law rules of the forum state to determine which state's substantive law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In New Mexico, which is the forum state in this case, choice-of-law questions for tort actions are resolved using the *lex loci delicti commissi* doctrine, otherwise known as the place-of-the-wrong test. *See Terrazas v. Garland & Loman, Inc.*, 142 P.3d 374, 377 (N.M. Ct. App. 2006); *Torres v. State*, 894 P.2d 386, 390 (N.M. 1995). Under this test, the place of the wrong is the "location of the last act necessary to complete the injury," unless "such application would violate New Mexico public policy." *Id.* Because no party contests that the last act to complete the injury took place in New Mexico, and because there is no reason to believe that applying New Mexico law to an incident in New Mexico affecting a New Mexican would violate the state's public policy, the Court applies New Mexico tort law to Plaintiff's three remaining claims. Indeed, even after making a prolonged argument for why this Court should apply Maryland law "in toto on the proceedings," Plaintiff's arguments for the three state claims rely on New Mexico law, thus implying his

---

[6] The Court also technically retains discretion to hear the state claims under its supplemental jurisdiction, authorized by 28 U.S.C. § 1367. As the Supreme Court recently contrasted in *Royal Canin U.S.A., Inc. v. Wullschleger*, when a federal court dismisses a federal claim, "an appellate court may yet revive [it]" so it is not "gone for good," whereas when a plaintiff amends their complaint to eliminate all federal claims, those claims are "gone for good." 604 U.S. 22, 33 (2025). For this reason, courts technically retain discretion to hear remaining state claims even after they have dismissed the federal claims. This accords with the supplemental jurisdiction statute, which provides that "district courts *may* decline to exercise supplemental jurisdiction," 28 U.S.C. § 1367(c) (emphasis added), if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

agreement with the applicability of New Mexico law to his state law claims. Doc. 48 at 13; *compare id.* at 2-13 (choice-of-law argument in Title II claim) *with id.* at 32-35 (analyzing tort claims under New Mexico law).

A federal court sitting in diversity to hear state claims is charged with "ascertain[ing] and apply[ing] the state law." *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944). Decisions from the state's highest court are the gold standard, but, in the absence of such authority, the federal court should "attempt to predict what the state's highest court would do." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003). This Court thus will consider each of Plaintiff's state law claims under applicable New Mexico case law.

1.    Claim for Intentional Infliction of Emotional Distress ("IIED")

Plaintiff alleges that the Hotel staff's "extreme and outrageous" conduct rose to the level of intentionally inflicting severe emotional distress on him. Doc. 48 at 34. He asserts that based on his experience, he now feels "stigmatized for being a Hispanic American" and "shame for who he is." Doc. 23 at 9. He also claims that the incident affected his work performance, and that he suffered "public humiliation" because other guests saw Ms. Rubio deny him the room. Doc. 23 at 9; Doc. 41-1 at 42:25-43:16; Doc. 48 at 34. The New Mexico Supreme Court has "adopted the approach used in the Restatement (Second) of Torts § 46." *Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 41 P.3d 333, 342 (N.M. 2002). Four elements must be proven to prevail on an IIED claim: "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress." *Id*. In this case, however, Plaintiff did not name Ms. Rubio as a defendant. Only her employer is named as a defendant in the Amended Complaint. Thus, a

threshold question is whether, assuming that Ms. Rubio's conduct was intentionally tortious, Defendant can be held vicariously liable for that conduct.

In New Mexico, "an employer is liable for an employee's torts committed within the scope of his or her employment." *Ocana v. American Furniture Co.*, 91 P.3d 58, 70 (N.M. 2004). Because intentional torts are usually considered to have been committed outside of the scope of an employee's employment, employers are not generally liable for an employee's intentional tort. *Id.* The Court has identified four exceptions to that rule under New Mexico law: (1) when an employee is "aided by [their] status as [a] supervisor" in committing an intentional tort, *Id.* ¶ 32 (aided-in-agency theory); (2) when "cumulative conduct of the employees" implies the "requisite culpable mental state" for recklessness by the employer, *Clay v. Ferrellgas, Inc.*, 881 P.2d 11 (N.M. 1994) (aggregate conduct by multiple employees of a natural gas company was sufficient to show a "cavalier attitude towards safety regulations" by the employer); (3) when an employer intentionally allows tortious conduct by an employee to continue with "utter indifference to the consequences," *Coates v. Wal-Mart Stores, Inc.*, 976 P.2d 999 (N.M. 1999) (upholding jury finding of employer liability after "high level supervisory personnel" at a Sam's Club observed multiple instances of "outrageous" sexual harassment by a lower level supervisor against an employee but failed to step in); and (4) when an employer has negligently hired an employee and the intentional tort committed by the employee was a "reasonably foreseeable result of the negligent hiring." *Medina v. Graham's Cowboys, Inc.*, 827 P.2d 859 (N.M. Ct. App. 1992).

After carefully considering these four exceptions to the general rule, the Court holds that none apply here. First, it is undisputed that Ms. Rubio was a non-supervisory front desk clerk, ruling out application of the aided-in-agency theory. Second, Plaintiff alleges an isolated incident. While he does allege several failures to act by Defendant's corporate management, he

does not allege any other specific discriminatory actions by Defendant's employees such that the "cumulative conduct by employees" exception could apply. Third, no supervisor at the Hotel was aware of the incident until after it had occurred. Therefore, the exception for when high-level supervisors knowingly permit outrageous behavior by an employee cannot apply. Finally, there is neither evidence nor allegation that Ms. Rubio was negligently hired and that the alleged discrimination that Plaintiff experienced was a reasonably foreseeable result of that negligent hiring. Since no exception recognized in New Mexico applies, and since Ms. Rubio was not named as a defendant in this action, Plaintiff's IIED claim must be dismissed as a matter of law.

      2.   <u>Claim for Negligent Infliction of Emotional Distress</u>

Plaintiff also asserts a negligent infliction of emotional distress ("NIED") claim. In support of this claim, Plaintiff alleges that Defendant and its agents "were negligent and careless of the probability that their acts would cause Plaintiff severe emotional and psychological distress and anguish." Doc. 23 at 9. Defendant argues that this claim must be dismissed because New Mexico only recognizes NIED claims in instances where the plaintiff contemporaneously perceives the death of, or a serious injury to, a spouse or immediate family member. *Folz v. State*, 797 P.2d 246, 257, 260 (N.M. 1990). In his Response, Plaintiff does not address Defendant's argument as to his NIED claim, and thus appears to have conceded to its dismissal. The Court agrees with Defendant that Plaintiff's NIED claim fails as a matter of law.

New Mexico only recognizes NIED claims in the limited circumstance of a bystander plaintiff who, among other necessary elements, has "contemporaneous sensory perception" of the death or serious injury of a spouse or other person with whom the plaintiff has an "intimate family relationship," such as a parent, child, or sibling. *Id.* In the instant case, Plaintiff has not alleged any facts that would establish these elements. Indeed, the Amended Complaint makes

clear that Plaintiff was traveling alone, rather than with a family member or friend, at the time he was denied a room at the Hotel. Accordingly, even accepting as true Plaintiff's version of the facts, there is no factual basis for Plaintiff's NIED claim, and that claim thus must be dismissed as a matter of law.

      3.    <u>Negligence Claim</u>

Finally, Plaintiff advances an ordinary negligence claim. In New Mexico, prevailing on such a claim "requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 73 P.3d 181, 185-86 (N.M. 2003). Plaintiff claims that Defendant breached its duties to: (1) "manage the premises and [its] agents in a lawful manner"; (2) "refrain from wrongfully causing damage to Plaintiff"; and (3) "refrain from unnecessarily breaching [his] right to occupancy and quiet enjoyment of the premises." Doc. 23 at 10. In its Motion, Defendant argues that Plaintiff's allegations "fail to show the existence or breach of any legally cognizable duty," and cites various authorities related to hotels' duties to patrons. Plaintiff's Response did not identify any facts in support of his negligence claim and instead repeated the same allegations as in the Amended Complaint. Doc. 48 at 34-35. In its Reply, Defendant asserts that it is entitled to judgment as a matter of law on Plaintiff's negligence claim because Plaintiff has failed to meet his burden of going beyond the pleadings to identify disputed facts that could allow him to prevail. Doc. 49 at 12.

The *Celotex* Court held that Rule 56(a) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 321. As mentioned *supra*, this requires the nonmoving party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. As the Tenth Circuit has admonished, the non-moving party cannot sustain its burden by "rest[ing] on the mere allegations in the pleadings." *Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Yet, reciting the pleaded allegations is precisely the route that Plaintiff has taken here. Rather than coming forward with the specific factual basis necessary to establish that Defendant's breach of a legally cognizable duty under New Mexico law was a proximate cause and cause in fact of Plaintiff's alleged damages, Plaintiff's Response rearticulates the same conclusory allegations contained in the Amended Complaint. There is no basis to find that Plaintiff went "beyond the pleadings," and thus *Celotex* requires that the Court grant summary judgment in Defendant's favor on Plaintiff's negligence claim.

## CONCLUSION

For the reasons set forth herein, the Court finds that the Court lacks subject matter jurisdiction over Plaintiff's Title II claim, and that there are no disputed material facts whose resolution at trial would permit Plaintiff to prevail on any of his remaining state law claims. Accordingly, Defendant is entitled to summary judgment in its favor.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment on All Counts in Plaintiff's Amended Complaint and Supporting Memorandum [Doc. 41] is **GRANTED** as follows: Plaintiff's Title II claim is dismissed without prejudice for lack of subject matter jurisdiction; and Plaintiff's state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence are dismissed with prejudice.

DATED this 4th day of September 2025.

_____
MARTHA VAZQUEZ
Senior United States District Judge